NO. 25-3282

---

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

STEPHANIE SEAGRAVES, et al.,
*Plaintiffs-Appellants*,

v.

DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, et al.,
*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

No. 3:24-cv-05081
The Honorable Tiffany M. Cartwright
United States District Judge

---

## APPELLANTS' OPENING BRIEF

---

ARNOLD JACOBOWITZ &
ALVARADO PLLC

NATHAN J. ARNOLD
WSBA No. 45356
720 Seneca Street, Ste. 107, No. 393
Seattle, WA 98101
(206) 799-4221

WESTERN WASHINGTON LAW
GROUP, PLLC

DENNIS MCGLOTHIN
WSBA No. 28177
10485 NE 6th St. #2620
Bellevue, WA 98004
(425) 728-7296

*Counsel for Appellants*

i

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................1

INTRODUCTION ...............................................................................................5

JURISDICTIONAL STATEMENT .........................................................................6

STATEMENT OF ISSUES ...................................................................................7

STATEMENT OF THE CASE ...............................................................................8

   B.   Procedural History .................................................................................12

STANDARD OF REVIEW .................................................................................13

SUMMARY OF THE ARGUMENTS ....................................................................18

ARGUMENT ...................................................................................................20

   C.   The First Amended Complaint Alleges Sufficient Facts to State a Plausible 42 U.S.C. § 1983 Claim for Monetary Relief Against the Individual Appellees Hunter, Rodriguez, and Ybarra in Their Personal Capacities. ............................20

      1.   Pleading standard for personal-capacity claim under§ 1983...................20

      2.   The FAC Alleges Sufficient Facts to Infer Appellee Ross Hunter Caused Constitutional Deprivations.........................................................................25

      3.   The FAC Plausibly Alleges Appellees Rodriguez and Ybarra Caused or Integrally Participated in Constitutional Deprivations. .....................................30

         a.   The FAC Properly Alleges Appellees Rodriguez and Ybarra, together with Secretary Hunter, Designed and Concocted the Mutli-Prong Approach, which Caused Constitutional Deprivations................................30

         b.   The FAC also Alleges Sufficient Facts to state a 42 U.S.C. § 1983 claim against Appellees Rodriguez and Ybarra for Integrally Participating in the Secularly Skewed Multipronged Approach....................................33

   D.   The First Amended Complaint was Sufficient to Demonstrate Plaintiffs' Free Exercise Rights were Violated. ...................................................................36

      1.   The Multipronged Approach Violates the Free Exercise Clause of the U.S. Constitution's First Amendment. ...........................................................38

         a.   The Multiprong Approach, the Accommodation Directive, and the Communications Directive Infringed on Plaintiffs' Free Exercise Rights..39

b.     The Multipronged Approach, Human Resources Directive, and Communication Directive are not Operationally Neutral...........................40

c.     The Multipronged Approach, Human Resources Directive, and Communications Directive were not Generally Applicable........................44

    *1)    Mechanism for ad hoc accommodation decisions.* ..........................45

    *2)    Favoring Secular Accommodations over Religious Accommodations.* ....................................................................................48

E.     The FAC Alleges Sufficient Facts to State a Procedural Due Process Deprivation Claim.............................................................................................52

F.     The FAC Alleged Sufficient Facts to Assert an Equal Protection Deprivation ...............................................................................................56

G.     The District Court should have Given Appellants Leave to Amend Their Pleading.................................................................................................59

H.     This Court Should Not Affirm the District Court's Decision on the Alternative Ground of Qualified Immunity..........................................................61

I.     The Court Should Enable the District Court to Award Attorney's Fees for this Appeal. ..............................................................................................66

J.     The District Court should Retain Jurisdiction over Appellants' State Law Claims. ..................................................................................................67

CONCLUSION.................................................................................................67

iii

# TABLE OF AUTHORITIES

## *Cases*

*Bates v. Pakseresht,* No. 23-4169, ___ F.4th ___, 2025 WL 2079875 (9th Cir. July 24, 2025) .............................................. 19, 36, 37, 38, 40, 42, 43, 44, 45, 47, 64

*Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988)...................................................22

*Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020) .......................... 40, 45, 64

*Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900 (1940).................................38

*Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 142 S. Ct. 1987, 213 L. Ed. 2d 286 (2022) .................................................................................................56

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) ................................................. 19, 20, 53, 55, 60, 64, 65, 66

*Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945 (9th Cir. 2010)................61

*Crawford-El v. Britton*, 523 U.S. 574 (1998) .........................................................17

*Cuevas v. City of Tulare*, 107 F.4th 894 (9th Cir. 2024) .........................................15

*Daniels v. Williams*, 474 U.S. 327 (1986) ...............................................................15

*Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)............52

*Diaz v. Int'l Longshoremen's & Warehousemen's Union, Local 13*, 474 F.3d 1202 (9th Cir. 2007).........................................................................................13

*Empress LLC v. City of San Francisco*, 419 F.3d 1052 (9th Cir. 2005) .................17

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) ................................................................ 38, 44, 45

*Frudden v. Pilling*, 877 F.3d 821 (9th Cir. 2017)....................................................16

*Fulton v. City of Phila.*, 593 U.S. 522, 141 S. Ct. 1868 (2021).................. 44, 46, 47

*Fuqua v. Raak*, 120 F.4th 1346 (9th Cir. 2024).......................................................55

*Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) ......................17

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) ..............................22

*Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018) .................................15

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...................................................... 16, 62

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) ................................................22

*Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156 (9th Cir. 2021) ..........................15

*Keene v. City & Cnty. of San Francisco*, No. 24-1574, 2025 WL 341831 (9th Cir. Jan. 30, 2025) ..............................................................................................................34

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 142 S. Ct. 2407 (2022) ...............38

*Kentucky v. Graham*, 473 U.S. 159 (1985) .............................................................20

*Kimes v. Stone*, 84 F.3d 1121 (9th Cir. 1996) ........................................................18

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) ......................................21

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993) ..................................................................................................17

*Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988) ........................................................21

*Lewis v. Clarke*, 581 U.S. 155 (2017) ....................................................................21

*Maddox v. City of Los Angeles*, 792 F.2d 1408 (9th Cir. 1986) ..............................15

*Masterpiece Cakeshop v. Colorado C.RT. Comm'n*, 584 U.S. 617, 138 S. Ct. 1719 (2018) ............................................................................................................. 40, 43

*Merritt v. Mackey*, 827 F.2d 1368 (9th Cir. 1987) .................................................22

*Miranda v. Clark County, Nev.*, 319 F.3d 465 (9th Cir. 2003) ...............................17

*Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009) ........................................17

*OSU Student All. v. Ray*, 699 F.3d 1053 (9th Cir. 2012) ........................................15

*Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) ...................................................30

*Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022) ......................................................21

2

*Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972)  52, 53

*Pilz v. Inslee*, No. 3:21-CV-05735-BJR, 2022 WL 1719172 (W.D. Wash. May 27, 2022) .................................................................................................54

*Pistor v. Garcia*, 791 F.3d 1104 (9th Cir. 2015) .....................................20

*Polanco v. Diaz*, 76 F.4th 918 (9th Cir. 2023)......................................62

*Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175 (9th Cir. 2007) 21, 22

*Redman v. Cty. of San Diego*, 942 F.2d 1435 (9th Cir. 1991).................23

*Rodriguez v. County of Los Angeles*, 891 F.3d 776 (9th Cir. 2018).......................22

*Rodriguez v. Santa Clara Valley Transportation Auth.*, No. 23-CV-01379-HSG, 2024 WL 4778049, (N.D. Cal. Nov. 12, 2024) ...................................................46

*Saucier v. Katz*, 533 U.S. 194 (2001) .......................................................16

*Scheibe v. ProSupps USA, Ltd. Liab. Co.*, 141 F.4th 1094 (9th Cir. 2025) ............13

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986)14

*Smith v. Janney*, 876 F. Supp. 2d 1204 (E.D. Wash. 2012)....................................60

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ................................................... 14, 29

*State v. Coria*, 120 Wash. 2d 156, 839 P.2d 890 (1992) .........................................15

*Stevenson v. Koskey*, 877 F.2d 1435 (9th Cir. 1989)...............................................21

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)....................................................17

*Tandon v. Newsom*, 593 U.S. 61, 141 S. Ct. 1294, 209 L. Ed. 2d 355 (2021)........48

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 137 S. Ct. 2012 (2017) ........................................................................ 20, 39, 40, 63, 64

*Unifyscc v. Cody*, No. 5:22-cv-01019-BLF, 2025 U.S. Dist. LEXIS 8233 (N.D. Cal. Jan. 15, 2025) .......................................................................50

*Vale v. City of Seattle*, No. 2:23-cv-01095-TLF, 2024 U.S. Dist. LEXIS 108289 (W.D. Wash. June 18, 2024)...............................................................66

3

*Vazquez v. County of Kern*, 949 F.3d 1153 (9th Cir. 2020) ....................................22

## *Statutes*

28 U.S.C. § 1291 ..............................................................................................6

28 U.S.C. § 1331 ..............................................................................................6

28 U.S.C. § 1343 ..............................................................................................6

28 U.S.C. § 1915 ............................................................................................16

42 U.S.C. § 1988 ............................................................................................66

WAC § 357-46-090 ........................................................................................49

WAC § 357-46-100 ........................................................................................49

WAC 357-46-095 ...........................................................................................49

## *Rules*

9th Cir. R. 39 ..................................................................................................66

Fed. R. Civ. P. 12(b)(6) ................................................... 13, 18, 28, 29

Fed. R. Civ. P. 8(a) ......................................................... 13, 16, 18, 28

Fed. R. Civ. P. 9(b) .......................................................................................16

## *Constitutional Provisions*

U.S. Const. Amdt. 1 .......................................................................................38

**INTRODUCTION**

Appellants, Plaintiffs below, appeal from the dismissal of their claims with prejudice and without leave to amend. Appellants lost their public employment with the State of Washington, allegedly for failure to comply with a vaccination requirement, but they allege that they were forced out because Appellees instituted a departmental policy of disfavoring those seeking exemption and accommodation for religious reasons, and denied them any opportunity for a hearing. This policy, instituted by a Secretary of the Department who had expressed a jaundiced, skeptical approach to religious objection to vaccination, had resulted in a significant disparity—50%—between the Department's accommodation of religious objectors, and accommodation of employees who sought medical (secular) exemption.

The District Court held Appellants failed to state Constitutional claims because, supposedly, they failed to sufficiently allege the personal participation of each Appellee in applying that policy, and because, in the District Court's view, neither the Free Exercise Clause, the Equal Protection Clause, nor the Due Process Clause forbade the kind of policy alleged by Appellants.

However, the District Court was in error on those points: Appellants alleged the existence and impact of the harmful policy and Individual Appellees' direct roles in crafting and directing the policy; and it is well established that the Constitution

5

prevents this kind of discriminatory discharge from employment, and requires notice and hearing before discharge.

At bottom, this case asks whether a rogue state agency can constitutionally discharge government employees, without notice or opportunity to be heard, merely because it does not approve of their religious beliefs. This Court, respectfully, should vindicate Appellants' rights, and the rights of government employees who happen to hold unpopular or inconvenient religious views, by reversing the District Court's order and remanding for factual development and trial.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, because Appellants claim deprivation of their civil rights under the U.S. Constitution. This appeal was timely noted May 20, 2025, from an Order dated April 23, 2025, denying Appellants' timely Motion for Reconsideration of an Order, dated April 7, 2025, granting Appellees' Motion to Dismiss Appellants' First Amended Complaint. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

6

**STATEMENT OF ISSUES**

1. Did Appellants state a claim for violation of their Free Exercise rights, alleging Appellees instituted a policy targeting religious objectors to an employee vaccination requirement? *Yes*.

1. Did Appellants state a claim for violation of their Equal Protection rights, alleging Appellees instituted a policy targeting religious objectors to an employee vaccination requirement? *Yes*.

2. Did Appellants state a claim for violation of their Procedural Due Process rights, alleging that Appellees instituted a policy of refusing pre- or post-termination hearings? *Yes*.

3. Was personal participation of Appellee Ross Hunter, the agency's Secretary, sufficiently alleged by allegations he expressed strong skepticism of religious objections to the vaccination requirement and a desire to treat such objections strictly but to find ways to grant secular objections? *Yes*.

4. Was personal participation of Appellees Marcos Rodriguez and Vickie Ybarra sufficiently alleged by allegations they personally participated in creating and directing the use of the discriminatory and procedurally violative policy described? *Yes*.

5. Did Appellants state a claim for prospective injunctive relief, where they have not been reinstated? *Yes.*

6. Should Appellants have been given leave to amend their complaint, to cure any shortfall in their allegations of each individual Appellee's personal participation in the alleged violations of Appellants' rights, and in alleging their substantive due process claim, where additional facts could have saved meritorious claims? *Yes.*

## STATEMENT OF THE CASE

This case arises from the failure of Appellees, the Washington Department of Children, Youth, and Families ("DCYF" or the "Department") and three of its decision makers, to lawfully implement a Proclamation by the then-Governor of Washington State (the "Proclamation"). 7-ER-1582–84. The Proclamation required state employees obtain a COVID-19 Vaccine (Vaccine) or receive exemption and accommodation or lose their continued public employment (the "Vaccine Requirement"). 7-ER-1582. The purpose of that requirement was to stem the spread of COVID-19. 7-ER-1609 ¶ 60; 7-ER-1626 ¶ 164.

Appellants, Plaintiffs below, are former employees of DCYF. 7-ER-1584–604. Each was employed as a permanent full-time employee only terminable for cause. 7-ER-1633 ¶ 217.

8

Each Appellant requested an exemption from the Vaccine Requirement based on a sincere religious belief which prevented them from accepting the Vaccine. 7-ER-1584–604. DCYF administratively granted each exemption request, necessarily finding that each Appellant held such a belief. *Id.* The formal grant of exemption was supposed to trigger individualized consideration of whether the Appellant could be accommodated by DCYF without undue hardship to DCYF. *Id.*; 7-ER-1630. But DCYF failed to sincerely attempt to accommodate the Appellant. 7-ER-1634. Therefore, each Appellant, being supposedly unable to be accommodated without undue hardship to DCYF, was terminated from their public employment position. 7-ER-1581, -1616.

Each Appellant was able to perform all essential functions of their employment while using frequent COVID-19 testing, personal protective equipment, and social distancing to minimize their risk of catching and/or spreading COVID-19; most of them could also perform those functions remotely, seven teleworked during the pandemic, before the Vaccine Requirement began. 7-ER-1584–604. They all requested, as accommodation, to use those alternatives, but DCYF rejected that option. *Id.* Appellants also asked for pretermination hearing to discuss possibilities, or at least dialogue on the subject; DCYF refused to hear any of them. *Id.* Nor did DCYF allow any post-termination hearings. 7-ER-1610 ¶ 68.

9

That refusal to engage with the religious objectors was consistent with Appellees' intentions, as expressed in internal and external communications. On August 16, 2021, Appellee Ross Hunter, the Secretary of DCYF, was asked how the Department would handle requests for religious exemption from the Requirement. He responded: "as strict as we are allowed to be." 7-ER-1605 ¶ 37. In contrast, two months later he sent internal email saying that when a "Safe" vaccine became available, "some employees will be unable (medically) to take it. How will we approve this?" 7-ER-1606 ¶ 44.

On August 23, 2021, Hunter sent an email to Appellees Marcos Rodriguez and Vickie Ybarra, respectively the Department's HR Manager and Assistant Secretary of Partnership, Prevention, and Services (7-ER-1584; 7-ER-1605), outlining a "multi-prong approach to vaccination," beginning with "[g]et vaccinated or lose your job." 7-ER-1605 ¶ 38. He listed potential objections to overcome, including sterility, pregnancy risks, 'microchip insertion" (a concept he ridiculed), convenience, "political tribalism," and "Religious objections, real or imagined." *Id.* ¶ 39. One resource for dealing with the last, was a video of statements from religious authorities including the Pope. *Id.* ¶ 40. The Department, he explained, would send a "strong message about the inability to hide behind the exemption strategy." *Id.* ¶ 41.

10

Accordingly, under the policies personally crafted and directed by Appellees Hunter, Rodriguez, and Ybarra, the Department made accommodation decisions as strictly as possible as to religious-exemption requests—but not as to medical-exemption requests. 7-ER-1608. As a result, DCYF was 50% more likely to accommodate its secular-exemption employees than the religious-exemption employees. *Id.*

In refusing to accommodate Appellants and so many other exempt religious objectors, Appellees failed to serve the Department's supposed interest of stemming the spread of COVID-19. 7-ER-1609. The State's guidelines required the Department to make accommodation decisions based on most current medical information. 7-ER-1607. Appellees knew and ignored, or should have known, per then-available studies, the Vaccine did not prevent transmission of the then-prevalent variant of COVID-19. 7-ER-1609. As was widely known, COVID-19 cases included a statistically significant number of cases where a previously vaccinated persons with reinfections and "breakthrough infections." 7-ER-1615. The chief reason was the Vaccine is not a traditional vaccine, or a "sterilizing vaccine," providing immunity to its recipient. *Id.* Theses Vaccines are mRNA vaccines, and "nonsterilizing." *Id.* They do not provide immunity. *Id.* Therefore, vaccination did little to stem the virus's spread. 7-ER-1616. Appellees were aware

11

of the virus's ineffectiveness when they crafted and directed the policy of disfavoring religious-exempt employees. *Id.*

Terminating Appellants did not prevent spread of COVID-19 because contractors who DCYF hired to perform their essential job functions after termination were not required to vaccinate. 7-ER-1612. Even more arbitrarily, DCYF allowed the workers who replaced Appellants to work remotely. 7-ER-1611 ¶ 75.

The impact of Appellees' policies was even more unfairly harmful due to the operative Collective Bargaining Agreement, which provides that an employee terminated for not being vaccinated for medical reasons is eligible for placement in the State's General Government Transition Pool Program, giving them a chance at public employment in some other agency; employees—such as Appellants—who were terminated for not being vaccinated for religious reasons were not eligible. 7-ER-1607.

**B. Procedural History**

Appellants brought this action seeking reinstatement and damages under 42 U.S.C. § 1983, violation of their Constitutional rights to free exercise of religion, equal protection of the law, and due process, as well as parallel State claims. 7-ER-1582–635. Appellants amended their complaint once. *Id.* They sought prospective injunctive relief of reinstatement by claims brought against DCYF and the Individual

12

Appellees in their official capacities, and damages under § 1983 against the Individual Appellees in their personal capacities; and damages against Appellees under the state-law causes of action. *Id.*

Appellees moved to dismiss the FAC under Fed. R. Civ. P. 12(b)(6) 2-ER-118–49. The District Court granted the motion on April 7, 2025. 1-ER-7–29. Appellants timely moved for reconsideration. 2-ER-31–39. The District Court denied that motion on April 23, 2025. 1-ER-2–4. This appeal was noticed on May 20, 2025. 7-ER-1636–38.

## STANDARD OF REVIEW

The Court reviews *de novo* dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, accepting all allegations in the complaint as true and construes them in the light most favorable to the nonmoving party. *Diaz v. Int'l Longshoremen's & Warehousemen's Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007). "To state a claim, a pleading need only contain 'a short and plain statement . . . showing that the pleader is entitled to relief[.]'" *Scheibe v. ProSupps USA, Ltd. Liab. Co.*, 141 F.4th 1094 (9th Cir. 2025) (quoting Fed. R. Civ. P. 8(a)(2)). "This rule means that [plaintiff's] complaint merely has to nudge his claim 'from conceivable to plausible.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). To state a 'plausible' claim,

13

Appellants must have pled facts that "allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* (quoting *Ashcroft v.] Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868, 884 (2009)).

Even when a complaint fails to pass that low bar and is dismissed for failure to state a claim, it is not normally dismissed with prejudice—instead, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (quoting *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).

After *Twombly* and *Iqbal*, *Starr v. Baca*, 652 F.3d 1202, 1212–16 (9th Cir. 2011), identified and addressed conflicts in Supreme Court's jurisprudence regarding pleading requirements. This Court held whatever the differences between the Supreme Court cases, there were two principles common to all:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

14

*Id*. at 1216. Taken together, the specific factual allegations in the FAC are sufficient for Plaintiffs to put Appellees on notice of the facts relied upon to support their 42 U.S.C. § 1983 claims against them.

42 U.S.C. § 1983 "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 474 U.S. 327, 329–30 (1986); see also *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1160 (9th Cir. 2021) (noting "the lack of a state-of-mind requirement in § 1983"); *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018); *OSU Student All. v. Ray*, 699 F.3d 1053, 1071 (9th Cir. 2012); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1413–14 (9th Cir. 1986). It is notable Plaintiffs' Free Exercise claim differs from its Equal Protection claim where Free Exercise violations do not require intent Equal Protection claims require discriminatory intent. *State v. Coria*, 120 Wash. 2d 156, 175, 839 P.2d 890,901 (1992).

"Qualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (citation and internal quotation marks omitted). It is premised on the theory that if an individual defendant's mistake as to what the law requires is reasonable, then the defendant is entitled to immunity.

15

*Saucier v. Katz*, 533 U.S. 194, 203 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Qualified immunity consistently is recognized as an affirmative defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982); and *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) ("Qualified immunity is an affirmative defense that the government has the burden of pleading and proving.") Despite qualified immunity being an affirmative defense 28 U.S.C. § 1915 requires dismissal at any time whenever a defendant is immune from suit.

Qualified immunity, because it involves a reasonableness analysis, seemingly requires a personal capacity defendant have a certain state of mind to not be immune from suit. Moreover, supervisory liability which may involve reckless and callous indifference to whether harm caused by certain conduct would constitute a deprivation also seemingly contains a state of mind requirement. Despite these state-of-mind elements perhaps being required, they do not change the pleading standards in 42 U.S.C. § 1983 actions. The U.S. Supreme Court and this Court have held that the Fed.R.Civ.P. 8(a), not the heightened pleading standards in Fed.R.Civ.P. 9(b),apply to § 1983 actions.

The Supreme Court and this Court have made clear for decades that 42 U.S.C. § 1983 claims require compliance with Fed.R.Civ.P. 8(a) pleading standards and that the heightened pleading standards of Fed.R.Civ.P. 9(b) do not apply. *Crawford-El*

16

*v. Britton*, 523 U.S. 574, 594–97 (1998); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–15 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions" such as actions brought under Rule 9(b)).

This Circuit also has held that a heightened pleading standard does not apply to constitutional claims brought against individual defendants, even those requiring a plaintiff to prove the individual defendant acted with an improper motive. *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1123–26 (9th Cir. 2002) (overruling *Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994)); *see also Empress LLC v. City of San Francisco*, 419 F.3d 1052, 1055–56 (9th Cir. 2005) (explaining that "the logical conclusion of *Leatherman*, *Crawford-El*, and *Swierkiewicz* dictates that a heightened pleading standard should only be applied when the Federal Rules of Civil Procedure so require"); *Miranda v. Clark County, Nev.*, 319 F.3d 465, 470 (9th Cir. 2003) (en banc) (same). However, after *Twombly* and *Iqbal*, a "bald allegation of impermissible motive" would not be sufficient. *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) discusses both *Twombly* and *Iqbal* and concludes that in cases wherein an improper motive is a necessary element, a plaintiff must allege something more than a bald assertion that a defendant acted with an improper motive. *Moss* goes further specifying all that is required is factual content contained within the complaint to allow a reasonable inference of improper motive to satisfy *Twombly* and *Iqbal*. *Moss*, 572 F.3d at 972.

17

"All that is required [by Fed. R. Civ. P. 8(a)] is that the complaint gives 'the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Kimes v. Stone*, 84 F.3d 1121, 1129 (9th Cir. 1996) (quoting *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir. 1991)). Plaintiffs have satisfied this standard, and their FAC should not have been dismissed with prejudice.

Because this appeal is taken from a dismissal under Fed. R. Civ. P. 12(b)(6), the operative facts are as alleged in Appellants' First Amended Complaint below ("FAC").

Specific Appellants are discussed *infra* where necessary, and for the record they are all listed here: Stephanie Seagraves, Belinda Brons, Benjamin Lupo, Charlene Ramirez, James Wilson, Kristin Rowland, Laura Cook, Mary Ahern, Michelle Whitlow, Melinda Alexander, Paulene Doughtery, Sandra Ruch, Spencer Mooers, Taylor Schrodt, Theresa Beyersdorfer Bogue, Tony Lacey, Tracie Dumas, and Yvette Hessler.

## SUMMARY OF THE ARGUMENTS

The District Court erroneously held that the three Individual Appellees' personal participation was not alleged. In fact, however, Appellee Hunter is alleged to have instituted a policy to disadvantage exemption-and-accommodation requests made on religious grounds, while favoring such requests when made on medical

18

grounds. And Appellees Rodriguez and Ybarra are alleged to have helped craft and direct the implementation of that policy and of a contributing communication policy to coerce religious objectors to act against their beliefs.

This Court's recent decision in *Bates v. Pakseresht*, No. 23-4169, ___ F.4th ___, 2025 WL 2079875, at *8 (9th Cir. July 24, 2025) largely controls the First Amendment Free Exercise claim here, confirming that a government policy which conditions the receipt of an otherwise available benefit on religious beliefs offends the Free Exercise clause. The Vaccine Requirement, as implemented by these Appellees, was not operationally neutral or generally applicable, where they retained the power to discriminate arbitrarily and in fact did apply it discriminatorily against religious objectors. For the same reasons, the Equal Protection violation claim is properly pled.

The FAC also states a claim for violation of the Due Process Clause, where Appellants were denied any pre- or post-deprivation *Loudermill* hearing on the loss of their tenured public employment positions.

At minimum, the District Court should have given, and this Court should at minimum give, Appellants leave to amend their pleading. Additional facts could fully cure the supposed pleading shortfalls called out by the District Court.

19

Although not reached by the District Court, Appellants anticipate further argument on appeal that their claims are barred by qualified immunity. That doctrine does not apply to their requests for reinstatement relief; moreover, the doctrines which support Appellants' claims are well-established, particularly by the seminal *Trinity Lutheran* and *Loudermill* cases.

Lastly, if this Court does reverse and remand for further proceedings, it should authorize the District Court in advance to award appellate attorney's fees as part of any subsequent fee award in the event that Appellants prevail at trial.

## ARGUMENT

**C. The First Amended Complaint Alleges Sufficient Facts to State a Plausible 42 U.S.C. § 1983 Claim for Monetary Relief Against the Individual Appellees Hunter, Rodriguez, and Ybarra in Their Personal Capacities.**

### 1. Pleading standard for personal-capacity claim under § 1983.

The FAC alleges sufficient facts to demonstrate that Individual Appellees each personally participated in causing the constitutional deprivations alleged in the FAC. "By its essential nature, an individual or personal capacity suit against [a government official] seeks to hold the [official] personally liable for wrongful conduct taken in the course of her official duties." *Pistor v. Garcia*, 791 F.3d 1104, 1114 (9th Cir. 2015). Stated another way, these suits "seek to impose personal liability upon a government

20

official for actions [the official] takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); see *Lewis v. Clarke*, 581 U.S. 155, 162 (2017). Liability in a personal-capacity suit can be demonstrated by showing that the official caused the alleged constitutional injury. See *Graham*, 473 U.S. at 166.

There are three ways to plead that an individual government official caused a Constitutional deprivation and injures a plaintiff, "if he [1]does an affirmative act, [2] participates in another's affirmative act, or [3] omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)); see *Lacey v. Maricopa County*, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc); *Stevenson v. Koskey*, 877 F.2d 1435, 1438–39 (9th Cir. 1989); *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). 42 U.SC. § 1983 makes an individual government official monetarily liable for compensatory and punitive damages even when their actions, alone, do not violate the U.S. Constitution when they are more than a mere bystander; rather they are "an 'integral participant' in the unlawful act." *Peck v. Montoya*, 51 F.4th 877, 889 (9th Cir. 2022) (quoting *Reynaga Hernandez*, 969 F.3d at 941).

21

Based on the foregoing principles, personal participation may be alleged by one of two methods:

> (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury.

*Peck*, 51 F.4th at 891; *see Preschooler II*, 479 F.3d at 1183 ("The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." (quoting *Johnson*, 588 F.2d at 743)); *see also Vazquez v. County of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020); *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018); *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999); *Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997); *Bateson v. Geisse*, 857 F.2d 1300, 1304 (9th Cir. 1988); and *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987).

To be clear, contrary to the District Court's erroneous reasoning below, allegations of that sort do far more than "fall back on the same theories of vicarious liability" which all agree cannot support a claim of personal liability for damages under § 1983. 1-ER-15. Vicarious liability is premised solely on the agency relationship between the defendant and the wrongdoer; it does

22

not require any participation at all by the supervising defendant. But when a government official personally participates by setting a policy which is "'the moving force of the constitutional violation,'" the result "**is not a form of vicarious liability. Rather, it is direct liability**." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991) (emphasis added) (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)).

The First Amended Complaint alleges sufficient facts to plausibly claim that each of the individual Appellees Hunter, Rodriguez and Ybarra caused Plaintiffs to be deprived of their rights guaranteed to them under the U.S. Constitution, namely their rights to: (1) Free Exercise of Religion guaranteed by the U.S. Constitution's First Amendment as made applicable to the states by its Fourteenth Amendment; (2) Equal Protection guaranteed by the U.S. Constitution's Fourteenth Amendment; and (3) Procedural Due Process guaranteed by the U.S. Constitution's Fourteenth Amendment. The plausibility of each of these 42 U.S.C. § 1983 claims will be discussed in other sections of this Opening Brief, *infra*.

Moreover, in yet another section of this Opening Brief arguing the district court abused its discretion in not permitting further amendment, the FAC also sufficiently alleged facts demonstrating the individual Appellees also caused a violation of the U.S. Constitution's Establishment Clause in the

23

U.S. Constitution's First Amendment as made applicable to the States by its Fourteenth Amendment. Specifically, the FAC alleged the individual Appellees had a common plan to target and challenge the particular religious beliefs of Christian Plaintiffs, particularly those who are Catholic, who sincerely believed that life begins at conception. These Plaintiffs' particular religious beliefs dictated their religious opposition to being injected with a COVID vaccine because they understood each of the three COVID vaccines was developed and tested using aborted fetal cells.

This section of the Opening Brief will focus on the argument that the FAC alleges sufficient facts to claim each individual Appellee caused or integrally participated in one or more of these Constitutional deprivations. First, it argues the FAC alleged sufficient facts to plausibly claim and infer each of them set in motion a series of acts by others which each of them knew or reasonably should have known would cause others to inflict constitutional harms. Second, it argues the FAC alleged sufficient facts to plausibly claim and infer each of them knew about and acquiesced in constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation.

24

**2. The FAC Alleges Sufficient Facts to Infer Appellee Ross Hunter Caused Constitutional Deprivations**

The most straightforward 42 U.S.C. § 1983 claim is the one alleged against DSHS's Cabinet Secretary Ross Hunter. The FAC clearly alleges Secretary Hunter set in motion the series of events that caused the Plaintiffs Constitutional Deprivations because he concocted and designed DSHS's multiprong approach to overcome objections to the vaccine requirement. The FAC specifically alleges Secretary Hunter was the multiprong approach's chief architect because he "concocted" and "designed" the approach. The FAC further alleges Secretary Hunter intended the multiprong approach to make religious accommodations as strict as possible while, at the same time, making sure secular medical accommodations were approved until a "safe" vaccine for a medical objector was developed. Finally, the FAC alleges Secretary Hunter presupposed religious beliefs were less legitimate than medical reasons to be excused from complying with the vaccine requirement. These factual allegations, standing alone, allege sufficient facts to state a 42 U.S.C. § 1983 claim against Appellee Hunter. The trial court erred when it glossed over these factual allegations and concluding they were conclusory and, thus, did not need to be deemed as being true.

Not only did the district court err when it disregarded these general factual allegations, its error became more profound when it expressly weighed

25

the evidentiary quality of far more specific factual allegations that corroborated and supported each of the foregoing more general factual allegations. The FAC alleges Secretary Hunter authored a series of three emails regarding the multiprong approach he concocted and developed. First, when asked if he had decided how he was going to handle approving religious accommodations, he responded that he had not decided the precise method for denying religious accommodations, but he promised that he would be as strict as he was allowed to be.

Secretary Hunter then sent a second email to individual Appellees Rodriguez and Ybarra. Appellee Rodriguez is alleged to have been DSHS's Human Resources Director who oversaw, supervised and handled all accommodation requests made by DSHS's employees who were exempt from complying with the vaccine requirement. In this second email, Secretary Hunter summarized the multiprong approach that he concocted and designed to overcome objections to being injected with the primary series of one of three COVID vaccines. His email, however, goes much farther than merely summarizing his campaign to overcome vaccine injection objections. It is alleged that Secretary Hunter expressly singled out religious objectors and parenthetically described their bases for opposing injection as being "real or imagined." Nowhere does the FAC allege he made specific reference to

26

secular or medical exemptions or parenthetically describing them as being real or imagined.

Additionally, it is alleged Secretary Hunter's second email specifically targeted Christians, especially Catholics, who sincerely held religious beliefs opposing vaccine injection because each vaccine was developed and tested using aborted fetal cells. In particular, Secretary Hunter designed a campaign to overcome these particular religious believers by challenging the legitimacy of their religious beliefs. He directed the campaign to provide information that the Pope and other religious leaders did not share those beliefs. (FAC ¶40). In doing so, he far overstepped the bounds of religious tolerance and neutrality.

Finally, it is alleged Secretary Hunter's second email described objections to the vaccine requirement as an exemption strategy. He directed a campaign to make clear that objectors would not be able to "hide behind" an "exemption strategy." He wanted to make sure all DSHS employees would either "get vaccinated or lose your job." As such, the only reasonable inference that can be drawn from these statements is it was concocted and designed to coerce those who objected to being injected with a COVID vaccine to become vaccinated. In the religious context, that necessarily means Secretary Hunter wanted to coerce them to abandon their religious beliefs and

27

be injected with a COVID vaccine by threatening their livelihood and continued public employment.

Then, it is alleged Secretary Hunter authored a third email that he sent to both Appellees Rodriguez and Ybarra. In that email he expressed a preference to accommodate DSHS employees who were granted a secular medical exemption from the vaccine requirement. He specifically stated that he wanted a process to approve secular medical exemptions until a new vaccine that was "safe" for these objectors was developed.

Considering these three emails together, the district court should have construed them as Secretary Hunter designing a multiprong accommodation approach that favored approving accommodations for secular medical exempt employees over approving accommodations for religious exempt employees. The FAC alleges Secretary Hunter's multiprong approach resulted in a "statistically significant" disparate impact that disproportionately affected religious exempt employees. It is alleged the multiprong approach resulted in a 50% higher accommodation rate for secular medical exempt employees than the accommodation rate for religious exempt employees.

Rather than construing all reasonable inferences in Plaintiffs' favor as required by Fed.R.Civ.P. 12(b)(6), the district court impermissibly waded into forbidden waters and weighed the evidentiary quality of the factual allegations

28

in Plaintiffs' Complaint and determined which inference amongst competing reasonable inferences should be drawn from the facts alleged.

It did so under a mistaken belief that Plaintiffs needed to allege more than what was required by Fed.R.Civ.P. 8(a), which is a short, plain statement of the facts and the claims being asserted. Seemingly, the district court justified its far too searching inquiry on *Twombly* and *Iqbal*. While *Twombly* and *Iqbal* may have clarified that something more than mere recitations of the bare essential elements of a 42 U.S.C. § 1983 claim must be alleged to withstand dismissal pursuant to Fed.R.Civ.P. 12(b)(6), the district court in this instance required much more than necessary for Plaintiffs to conduct discovery into the multiprong approach that had a disproportionate impact on them and other religious exempt employees who were not accommodated.

This Court in *Starr*, 652 F.3d at 1212, identified and addressed conflicts in the Supreme Court's jurisprudence on the pleading requirements applicable to civil actions. It holds that whatever the differences between the Supreme Court cases, there were two principles common to all:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Id*. at 1216. The district court, thus, erred when it dismissed the FAC with prejudice and without further leave to amend based on its mistaken belief that the FAC did not adequately allege facts that Appellee Hunter personally participated in Constitutional deprivations.

### 3. The FAC Plausibly Alleges Appellees Rodriguez and Ybarra Caused or Integrally Participated in Constitutional Deprivations.

#### a. The FAC Properly Alleges Appellees Rodriguez and Ybarra, together with Secretary Hunter, Designed and Concocted the Mutli-Prong Approach, which Caused Constitutional Deprivations.

The FAC alleges, based on information and belief, that Appellees Rodriguez and Ybarra worked together with Secretary Hunter to design and concoct the multiprong approach. Plaintiffs based on information and belief allegations were proper, and the district court should have accepted those allegations as true. In *Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) this Court held "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." (citation omitted).

Both circumstances justifying allegations based on information and belief are present in this case. First, only the individual Appellees have

30

knowledge about whether, and to what extent, Appellees Rodriguez and Ybarra designed and concocted the multiprong approach.

Second, the other factual allegations in the FAC, especially the two Hunter emails Appellees Rodriguez and Ybarra received, fairly suggest they both worked collaboratively with each other and Secretary Hunter to design and concoct the multiprong approach. Secretary Hunter sent two of his three emails he authored to Appellees Rodriguez and Ybarra. In the first of these two emails they received in August 2021, Secretary Hunter impugned the legitimacy of religious beliefs that conflicted with the ability to comply with the vaccine requirement by gratuitously and parenthetical editorializing them as being either "real or imagined." In that same email, Secretary Hunter singled out for attack Christians and, in particular Catholics, who sincerely held pro-life religious beliefs and directed DCYF wide communications to publicly attack their specific religious beliefs as being unfounded because faith leaders held different views. Secretary Hunter also referred to vaccine objections as an "exemption strategy" that the objectors were trying to "hide behind." In no uncertain terms he made clear that he was not going to permit that to happen.

Secretary Hunter authored a third email, which was the second email that he sent to Appellees Rodriguez and Ybarra, two months later in October

31

2021. In that email Secretary Hunter requested that Appellees Rodriguez and Ybarra provide a mechanism whereby accommodations for medical objectors would be approved until a "safe" vaccine was developed for them. These specific factual allegations support the allegations Plaintiffs made based on information and belief that both Appellees Rodriguez and Ybarra worked collaboratively with each other and Secretary Hunter to design and concoct the policy by which DCYF' human resources employees would approve accommodations for DCYF's employees who were exempt from the vaccine requirement and how the communications employees would communicate the accommodations policy to DCYF employees to coerce them into getting vaccinated rather than seek accommodations.

The district court should have accepted Plaintiff's allegations that were based on information and belief as being true. If it had, then the district court should have determined the FAC alleged sufficient facts to state a claim that Appellees Rodriguez and Ybarra caused the Constitutional deprivations alleged in the FAC by setting into motion the series of events that resulted in those deprivations.

32

### b. The FAC also Alleges Sufficient Facts to state a 42 U.S.C. § 1983 claim against Appellees Rodriguez and Ybarra for Integrally Participating in the Secularly Skewed Multipronged Approach.

Even if the Court were to discount or even disregard the information and belief allegations in the FAC, which it should not do, the allegations are still sufficient to state a claim for relief under 42 U.S.C. § 1983 against Appellees Rodriguez and Ybarra. The FAC alleges they knew about and acquiesced in the constitutionally defective conduct as part of a common plan with Hunter, whose conduct constituted the § 1983 violations. They received two of the three emails Secretary Hunter authored. In the first one they received, Secretary Hunter derogatorily editorialized religious beliefs that an employee claimed conflicted with their ability to comply with the vaccine requirement as being either "real or imagined." He singled out pro-life believers, specifically referencing both Christians and Catholics, for public attack on their foundational religious beliefs because certain faith leaders did not share in their beliefs on doctrinal grounds. He made clear that accommodation would not be approved for them to "hide behind" an "exemption strategy" to avoid complying with the vaccine requirement. He wanted them all to know that they would either "get vaccinated or lose your job."

33

Armed with this knowledge they knew or should have known the multiprong approach impermissibly infringed on the religious beliefs and practices of employees who should be religious exempt from complying with the vaccine mandate. They knew or should have known that the infringement on their Free Exercise rights was the product of Secretary Hunter's skepticism as to the legitimacy of their religious beliefs. They knew or should have known that discrediting the sincerely held religious beliefs of pro-life believers, and specifically targeting Christians, including Catholics, whose faith leaders shared a different doctrinal belief violated the Establishment Clause. Finally, they knew or should have known that Secretary Hunter was favoring accommodation approvals for secular medical exempt employees when they received the third mail Secretary Hunter sent them.

Despite their knowledge, they designed and concocted an accommodation policy that Director Rodriguez directed his subordinates in DCYF's Human Resources Department to use when denying religious accommodations and Appellee Ybarra directed her communications team to communicate to DCYF's employees in a coordinated attempt to coerce DCYF's employees who should have been granted an exemption from the vaccine requirement to abandon their religious beliefs and be injected with the COVID vaccine lest they lose their job and livelihood. This Court has recently

34

recognized this to be an affront to their dignity that causes irreparable harm. *See*, *Keene v. City & Cnty. of San Francisco*, No. 24-1574, 2025 WL 341831, at *2 (9th Cir. Jan. 30, 2025).

Appellees Rodriguez and Ybarra knew about and acquiesced in the multiprong approach that they knew or should have known favored approving accommodation request made by unvaccinated secular medical exempt employees over unvaccinated religious exempt employees. The FAC alleges the impact of the implemented skewed multiprong approach fell disproportionately on the religious exempt DCYF employees (over 50%) (FAC ¶¶43 and 58).

The same is true for Secretary Hunter. He affirmatively directed his subordinates, including Appellees Rodriguez and Ybarra, to implement his skewed multiprong approach to accommodating exempt employees which he summarized in his August 2021 email to them. He knew or should have known that the multiprong approach he directed them, to implement was skewed favorably to approve secular medical accommodations over religious accommodations. He knew or should have known that the reason for the disparate treatment between these two classes of exempt employees was based on his perception that religious beliefs were less legitimate and, therefore, less deserving of accommodation. Despite having this information he, along with

35

Appellees Rodriguez and Ybarra, implemented and directed his subordinates to use the multiprong approach to coerce religious adherents to get vaccinated over their sincerely held religious beliefs and practices. They all knew this would harm the Plaintiffs. The allegations are sufficient to infer these individual Appellees were recklessly and callously indifferent as to whether the harm that would be caused constituted a Constitutional deprivation.

In conclusion, the FAC alleges sufficient facts to state a claim for monetary relief against the individual Appellees Hunter, Rodriguez and Ybarra in their personal capacities. The trial court erred when it placed its thumb on the scale by not accepting Plaintiffs' well-pleaded allegations as true and not drawing all inferences in Plaintiffs' favor when deciding Appellees' Motion to Dismiss. In fact, the district court went to great lengths to weigh the evidentiary quality of the facts alleged in the FAC and engaged in an improper analysis and decided amongst competing reasonable inferences from the facts alleged in the FAC.

### D. The First Amended Complaint was Sufficient to Demonstrate Plaintiffs' Free Exercise Rights were Violated.

This case is largely controlled by this Court's recent decision that is designated for publication in *Bates v. Pakseresht,* No. 23-4169, ___ F.4th ___, 2025 WL 2079875, at *8 (9th Cir. July 24, 2025). The facts in *Bates* are that Oregon enacted a general policy requiring certain criteria be met for a prospective adoptive

parent to be certified as being permitted to adopt. The policy requires any prospective adoptive parent demonstrate their independent ability to provide for an adopted child's development and support and to maintain the child's identity and heritage. *Id*. at *2. Ostensibly this may be facially neutral. The administrative agency charged with certifying a prospective adoptive parent promulgated an administrative rule that implemented the general policy, and the rule required a prospective adoptive parent to "[r]espect, accept and support the…sexual orientation, gender identity, [and] gender expression" of an adopted child. *Id*.

The plaintiff in *Bates* is a prospective adoptive parent who is also a devout Seventh Day Adventist. She candidly fronted to the agency that she would love her child, adopted or genetic, no matter what their orientation or identity, but her religious beliefs conflicted with hormone therapy to treat gender dysphoria and wearing clothes of the opposite gender that a child is assigned at birth. Based on her admission, the agency would not certify her as being eligible to adopt in Oregon. *Id*. at *5-6.

The adoptive parent sued for declaratory and injunctive relief claiming the administrative rule violated her Free Exercise and Free Speech rights. The district court denied her request for a preliminary injunction *Id*. at 6.

37

In a divided opinion, Judges Brees and Hawkins were in the majority and issued a decision on July 2, 2025, that is designated for publication. Their decision reversed the district court's denial of the prospective adoptive parent's request for a preliminary injunction. Unlike the district court judge, they found the prospective adoptive parent demonstrated a likelihood of success on both her Free Exercise and Free Speech claims. *Id*. at *8.

The Free Exercise Analysis in *Bates* echoes the arguments Plaintiff made to the district court in this case. Like the district court judge in *Bates*, the district court judge in this case also rejected those arguments. Now, Appellants turn to this Court, trusting that their similar arguments will be as well received as the adoptive parents' arguments were received in *Bates.*

1. <u>The Multipronged Approach Violates the Free Exercise Clause of the U.S. Constitution's First Amendment.</u>

The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amdt. 1. The U.S. Supreme Court has held the Free Exercise Clause applicable to the States under the terms of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900 (1940). It protects religious exercises, whether communicative or not. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523, 142 S. Ct. 2407, 2421 (2022); and *Bates,* at *8). This right springs from the constitutional principle "that government may not

38

insist upon our adherence to state-favored orthodoxies, whether of a religious or political variety." *Kennedy*, 597 U.S. at 523; and *Bates* at \*8. "Nor can the state 'condition receipt of an important benefit' upon our agreement to the same." *Bates*, at \*8 (quoting *Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 717, 101 S.Ct. 1425 (1981)). "Likewise, a law that burdens the free exercise of religion triggers strict scrutiny if it is not neutral and generally applicable." *Id*. (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32, 113 S.Ct. 2217 (1993); and *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc)).

Here, Secretary Hunter's multipronged approach, Director Rodriguez's human resources directive, and Appellee Ybarra's communication directive when combined significantly infringed on Plaintiffs' Free Exercise rights and they are neither neutral nor generally applicable.

### a. The Multiprong Approach, the Accommodation Directive, and the Communications Directive Infringed on Plaintiffs' Free Exercise Rights

As thoroughly argued and explained, *supra*, Appellee Hunter's multipronged approach, Appellee Rodriguez's accommodation directive to his subordinates, and Appellee Ybarra's communication directives to her subordinates combined significantly infringed on Plaintiff's sincerely held religious beliefs. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462, 137 S. Ct. 2012

(2017) ("To condition the availability of benefits ... upon a recipient's willingness to ... surrender his religiously impelled status effectively penalizes the free exercise of his constitutional liberties.") (brackets omitted) (quoting *McDaniel v. Paty*, 435 U.S. 618, 626, 98 S. Ct. 1322 (1978) (plurality op.)).

They were designed and concocted by the respective individual Appellees to coerce employees to abandon their sincerely held religious beliefs and be injected with the primary series of one of three approved COVID vaccines. The coercive technique was a direct and blunt threat that they either "get vaccinated or lose your job." By conditioning their continued public employment, which is otherwise terminable only for specific reasons, the approach and directives infringed on the Plaintiffs' Free Exercise rights.

### b. The Multipronged Approach, Human Resources Directive, and Communication Directive are not Operationally Neutral.

Assuming, without conceding, the vaccine requirement is facially neutral, it is not operationally neutral as implemented by the three individual Appellees and as applied to the Plaintiffs. "A facially neutral law need not exclusively burden religious persons to be regarded as non-neutral in operation." *Bates* at *17. In fact, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Bates* at *17 (quoting *Masterpiece Cakeshop v. Colorado C.RT. Comm'n*, 584 U.S. 617, 638, 138 S. Ct. 1719 (2018) (quoting Lukumi, 508 U.S. at 534, 113 S. Ct. 2217). Departures from neutrality is all that is necessary for a Free

Exercise violation - a motive to act unconstitutionally is not. *Id.* When government conditions a public benefit or right on abandoning religious beliefs it "'punishes the free exercise of religion' by 'impos[ing] special disabilities on the basis of… religious status.'" *Bates* at *18 (quoting *Trinity Lutheran*, 582 U.S. at 462 (quoting *Lukumi*, 508 U.S. at 533)). Government actions of this kind are not generally applicable when they impose "'a penalty on the free exercise of religion,' which 'triggers the most exacting scrutiny.'" *Id*. (quoting *Trinity Lutheran,* 582 U.S. at 462); and *Blais v. Hunter*, 493 F. Supp. 3d 984, 999-1000 (E.D. Wash. 2020) (Mendoza, J.).

Here, the approach and directives when combined made clear to Plaintiffs that they must either "get vaccinated or lose their job." Their continued public employment was conditioned on them being injected with a COVID vaccine that was contrary to their religious beliefs or them applying for and being granted a religious exemption and DCYF approved accommodation. But the multipronged approach and accommodation directive were rapaciously skewed to favor accommodating secular medical exemptions over religious exemptions such that religious exempt employees were at least 50% less likely to have their religious accommodation approved when compared to a secular medical exempt employee's accommodation request.

41

Additionally, Secretary Hunter's presupposed the illegitimacy of religious beliefs and practices in his email summarizing his multipronged approach. He derogatorily characterized religious objections as being either "Real or imagined" and stated they were an "exemption strategy" that employees would "hide behind" to avoid complying with the vaccine requirement. He required Appellee Ybarra to communicate in no uncertain terms that he would not allow what he believed to be illegitimate religious beliefs to serve as an exemption strategy that could be hidden behind to avoid the vaccine requirement. He expressly directed the DCYF-wide communication to be "get vaccinated or lose your job." Finally, he then urged that the accommodation directive to be used to accommodate secular medical exempt employees from the vaccine mandate until a "safe" vaccine for them was developed. Combined, this was either an unveiled or, at best, a thinly-veiled technique to coerce religious exempt employees to abandon their religious beliefs and succumb to the vaccine requirement. The coercive hammer was a blunt statement that a religious exempt employee would be generally denied accommodation and needed to be vaccinated or else they would lose their job and livelihood.

It is also apparent that Secretary Hunter specifically targeted pro-life religious beliefs wherein faith leaders within the denominated religion expressed a different doctrinal belief. He directed Appellee Ybarra to develop, and Appellee Ybarra designed and concocted, a communications strategy that published to all DCYF

42

employees the inconsistencies within these denominations, especially Christians, including Catholics, which he specifically identified with explicit reference to the Pope's statements about the COVID vaccines. It was clear he promoted religious beliefs within a denomination that did not conflict with the ability to comply with the vaccine requirement over religious beliefs that conflicted with the ability to comply with the vaccine requirement. As recently clarified by the U.S. Supreme Court and now in *Bates,* this violated the Establishment Clause, which is the first clause in the U.S. Constitution's First Amendment.

> By drawing a distinction between different types of religious beliefs—those that "affirm" LGBTQ+ identity and those that are "unsupportive of people with diverse SOGIE"—Oregon runs into a related neutrality principle "fundamental to our constitutional order": that the state must "maintain 'neutrality between religion and religion.

*Bates,* at \*16 (quoting *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1594 (2025) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968))). Here, the three individual Appellees drew a distinction between religious beliefs that did not conflict with the ability to comply with the vaccine requirement and religious beliefs that did conflict with the ability to comply with the vaccine requirement. They openly publicized their support for the former and their disdain for the latter. Their actions are the anathema of maintaining religious tolerance and neutrality, which is required by the U.S.

Constitution's First Amendment. *Masterpiece Cakeshop,* 584 U.S. at 638; *Bates,* at *14. In short, they also violated the Establishment Clause.

To assess neutrality the court was required to, but did not, "carefully examine the totality of the circumstances surrounding its application, including 'the effect of [the] law in its real operation,' which 'is strong evidence of its object.'" *Bates,* at *14 (quoting *Lukumi*, 508 U.S. at 540, and citing *Masterpiece Cakeshop*, 584 U.S. at 638–39.) The statistically significant disproportionate impact on religious exempt employees, like Plaintiffs, was specifically alleged in the FAC but ignored and not addressed by the district court.

The district court erred in dismissing Plaintiffs' FAC with prejudice and without leave to amend because the approach and directives were not operationally neutral and the expressed preference of intradenominational beliefs screamed of allowing further amendment rather than concluding it would be futile.

### c. *The Multipronged Approach, Human Resources Directive, and Communications Directive were not Generally Applicable*

To be generally applicable, and, thus, avoid strict scrutiny, government actions that infringe on Free Exercise rights must not treat secular activities more favorably than religious activities. Additionally, there can be no mechanism by which decision makers are allowed to approve ad hoc accommodations that make exceptions for some to a general policy. *Bates*, at *13; and *Fellowship of Christian*

44

*Athletes*, 82 F.4th at 685 (citing *Lukumi*, 508 U.S. at 546). The approach and directives here are not generally applicable because they do not satisfy either of those two general applicability requirements.

### 1) Mechanism for ad hoc accommodation decisions.

When there is discretion in applying a facially neutral policy like the vaccine requirement, the denial of a religious accommodation "can raise the prospect of religious discrimination, and thus a Free Exercise Clause violation, even if there is no overt religious animus." *Fulton v. City of Phila.*, 593 U.S. 522, 533, 141 S. Ct. 1868 (2021); ("A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" (quoting *Smith v. Org. of Foster Fams. For Equal. & Reform (OFFER)*, 431 U.S. 816, 884, 97 S. Ct. 2094 (1977)); and *Fellowship of Christian Athletes*, 82 F.4th at 685. This "reflects the overarching principle that, to avoid strict scrutiny, a supposedly neutral policy cannot leave officials with the discretion to decide when the policy applies." *Bates,* at *18 (citing *Fellowship of Christian Athletes*, 82 F.4th at 685 (citing *Fulton*, 593 U.S. at 533)). "Strict scrutiny is therefore warranted in these contexts, 'regardless whether any exceptions have been given" under the policy." *Id*. (quoting *Fulton*, 593 U.S. at 537).

45

This case is like *Bates*, which is like *Blais*, it involves government requirements that "appear neutral but in practice gerrymander to create unequal effect." *Bates,* at \*15; and *Blais* at 998.

The government requirement in *Bates* and *Blais* did not provide unfettered discretion to a decision maker to make an exception to a general policy at the decision maker's sole discretion; rather they permitted substantial discretion in granting exceptions. Still in both cases the concern was similar to the concern in *Fulton*: "it incorporates ad hoc decision making based on non-objective criteria, in an area that implicates unique religious concerns." *Bates*, at \*19; and *Blais* at 998. "This creates the distinct possibility of uneven application of the policies…, posing an undue risk of case-by-case discrimination on the basis of religion." *Id*. The gravamen of the concern is the government's failure to "maintain a formal set of criteria by which it assesses" to whom the policy does and does not apply. *Bates,* at \*19. To trigger strict scrutiny, therefore, discretion need not be unfettered; rather it needs to be ample enough to make ad hoc decisions. *Id*.

Such was the case in *Rodriguez v. Santa Clara Valley Transportation Auth.*, No. 23-CV-01379-HSG, 2024 WL 4778049, (N.D. Cal. Nov. 12, 2024). The district court was confronted with dueling cross motions for summary judgment as to whether the accommodation policy was subject to strict scrutiny or rational basis review based on a determination whether it was generally applicable. The Court did

46

not grant either summary judgment motion. As to operational neutrality, it considered a single email that was sent by an exemption and accommodation committee member stating that the applicant's basis for religious exemption ("the mark of the beast") should go straight to denial. The district court concluded: "A reasonable factfinder could conclude that such correspondence evinces an 'intoleran[ce] of religious beliefs' that is fatal to generally applicability. *Id, at \*5* (citing *Fulton*, 593 U.S. at 533). Here, Secretary Hunter's were more inculpatory than the single email in *Rodriguez*, and *Rodriguez* was a summary judgment proceeding after the plaintiff was permitted discovery. Additionally, because neither party demonstrated the criteria upon which accommodation decisions were based, there was "a genuine dispute of material fact as to the discretion that the government exercised and, by extension, to the policy's general applicability." *Id*. The district court ordered a trial to determine these factual issues prior to resolving any other disputed issues and claims. *Id*. The district court here concluded that a simple reference to Title VII and the Washington Law Against Discrimination (WLAD), standing alone, sufficiently cabined the decision maker's discretion such that the accommodation directive was generally applicable. Plaintiffs disagree and they argue that if the evidence submitted in the cross motions for summary judgment proceedings in *Rodriguez* was sufficient to create a genuine fact issue in summary judgment proceedings, then the allegations in the FAC, which exceed the evidence

47

in *Rodriguez*, are more than ample to state a plausible 42 U.S.C. §1983 claim based on the accommodation directives conferring sufficient discretion on the decision maker to make ad hoc accommodation decisions.

In conclusion, there were no objective criteria to govern accommodation decisions. Moreover, the emails from Secretary Hunter presupposed the illegitimacy of religious beliefs by derogatorily editorializing them as being either "real or imagined" and characterizing them as an "exemption strategy" for employees to "hide behind" to not comply with the vaccine requirement while he never questioned the legitimacy of secular medical exemptions. Strict scrutiny is, therefore, warranted in this case, *Bates*, at \*18 (citing *Fulton*, 593 U.S. at 537).

### 2) *Favoring Secular Accommodations over Religious Accommodations.*

The approach and directives favored approving accommodations for secular medical exemptions over religious exemptions. First, Secretary Hunter's first email states his intent to make religious accommodations as strict as they were allowed to be. Then two months later, he lobbied and advocated for accommodations to be approved to secular medical exempt employees until a vaccine that was "safe" for them was developed. This expresses, or at the very least permits a reasonable inference that there was, a preference to approve secular medical accommodations over religious accommodations. The preference is corroborated by the results that

occurred. There was a statistically significant and disproportionate impact between accommodation approval rates for secular medical accommodations when compared to religious accommodations. Moreover, the perceived risk of having an unvaccinated individual continue their public employment is the same whether that employee was permitted to work because of a medical or a religious reason. The difference in why they were exempt cannot be a basis to treat the two differently. There is simply no difference in risk to the government's compelling interest to stem COVID's spread whether the employee is accommodated and allowed to work for medical or religious reasons. *See Tandon v. Newsom*, 593 U.S. 61, 62, 141 S. Ct. 1294, 1296, 209 L. Ed. 2d 355 (2021) ("whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue.")

Additionally, there is a marked difference in treatment that treats medical exempt employees who could not be accommodated far better than religious exempt employees who could not be accommodated. Medical exempt employees were required to be granted a disability separation, and even though they were not laid off, the State allowed them to register to be included in the General Government Transition Pool, which requires they be reinstated if a State position becomes available for which they qualify within a certain amount of time. *See* WAC 357-46-095(5), whereas State Office of Financial Management guidance instructs that

49

religious objectors will not be eligible for placement through that program. 7-ER-1607 ¶ 52. The Washington Administrative Code further provides: "The purpose of the transition pool program is to minimize the effects of staff reductions on general government employees while meeting needs of general government employers to fill vacant position." WAC § 357-46-090. Further, "[g]eneral government employers must provide for consideration of transition pool candidates when a certified pool contains eligible candidates other than candidates from the employer's internal or statewide layoff list or the employer's internal promotional eligibles." WAC § 357-46-100 (1). DCYF's policy to create eligibility for this benefit to those separated from State employment for medical inability to receive the vaccine, but not those separated from State employment for religious inability to receive the vaccine, further violates Appellants' Free Exercise and religious Equal Protection rights. The latter are not only terminated at higher rates, they are also less likely to find similar employment in Washington State.

An analogous situation arose in *Unifyscc v. Cody*, No. 5:22-cv-01019-BLF, 2025 U.S. Dist. LEXIS 8233 (N.D. Cal. Jan. 15, 2025), on motions for preliminary injunction and summary judgment. The *Unifyscc* plaintiffs prevailed on their preliminary injunction motion because that district court found a likelihood of success on the merits based on their argument that "the County 'treated medically exempt employees…more favorably than [similarly situated] religiously exempt

50

employees," because medically exempt employees were "entitled to priority consideration for placement in or selection for vacant positions." *Id*. at *43. Just so, Appellants found themselves in a less favored status, as members of the group of ex-employees discharged because of religious inability to vaccinate, compared to those with a secular basis preventing vaccination, who were placed in the GGTP. Appellants found themselves in a less favored status, as members of the group of ex-employees discharged because of religious inability to vaccinate, compared to those with a secular basis preventing vaccination, who were placed in the GGTP.

At summary judgment, the *Unifyscc* court "formally conclude[d] that the County's implementation of an accommodations procedure that favored individuals with exemptions based on disability over those with exemptions based on religion was not neutral and generally applicable." *Id*. at *43-44. That court found "this 'priority consideration' may have effectively disfavored certain exempt employees based on religion." *Id*. at *44. That court therefore held that strict scrutiny applied, and, further, that the policy was not narrowly tailored. *Id*. Ultimately, the court in *Unifyscc* did not grant summary judgment to the plaintiffs on Free Exercise, because the plaintiffs had not provided airtight, undisputed proof of having been harmed in comparison to a concrete example of a medically-exempt individual who did receive priority consideration after discharge by the Appellees. *Id*. at *46. But here, at the motion to dismiss stage, the Appellants should have been allowed to proceed to

51

discovery on this claim, to determine whether that dispositive fact is different in this case, *i.e.*, to prove their comparatively unfavorable treatment.

### E. The FAC Alleges Sufficient Facts to State a Procedural Due Process Deprivation Claim.

Government action that denies a person a public benefit, such as continued public employment, because they were exercising their rights under the U.S. Constitution is, itself, unconstitutional.

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).

*Perry* also clearly established that procedural due process under the U.S. Constitution requires government employers to provide their employees who asserts they have a right to continued public employment, even in the absence of a written employment agreement or a property right to continued public employment, "an

52

opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.' " *Perry*, 408 U.S. at 603.

In 1984, the U.S. Supreme Court decided *Davis v. Scherer*, 468 U.S. 183, 193, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984). In footnote 10, *Davis* made clear, citing *Perry*, that a government employer that does not provide its employee any form of pre-deprivation hearing was unconstitutional. *Id*. at n.10.

Finally, in 1985, the U.S. Supreme Court clarified the minimum procedural due process to which a public employee claiming a right to continued public employment was guaranteed under the Fourteenth Amendment's Due Process clause. It emphasized that procedural Due Process requires the government to afford a public employee "some kind of a hearing" prior to the discharge." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (citing *Perry*, 408 U.S. at 599). "The need for some form of pretermination hearing, recognized in these cases, is evident from a balancing of the competing interests at stake. The competing interest are the public employee's private interests in retaining employment, the government employer's interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Loudermill*, 470 U.S. at 543.

53

The FAC alleges that the Plaintiffs were not afforded a pre-deprivation hearing prior to discharge. Nor were they permitted a post-discharge evidentiary hearing. The Plaintiffs claim their employment agreement entitled them to continued public employment absent certain specified grounds. This was corroborated by the Collective Bargaining Agreement their union entered into with the State. As such, they were entitled, but did not receive, a pre-deprivation hearing as to the grounds for their discharge.

Pre-deprivation notice and hearing was also expressly required by the State's own guidelines implementing the vaccine requirement. It required each agency to engage in basic fact finding. *See* OFM Guidance v.3, ¶ 49. The FAC alleges that Plaintiffs were not provided adequate notice or a meaningful opportunity to be heard prior to the State terminating their continued public employment. Moreover, Appellees make no claim they complied with this requirement. Moreover, the State's own guidelines also require the agency give an employee who it cannot accommodate pre-separation notice so that a meeting could occur between the decision maker and the employee. *See* OFM Guidance v.3, ¶ 45. Plaintiffs allege they were deprived of adequate notice or a *meaningful* opportunity to be heard. They allege the only communications between them and the agency were a sham because the meeting was with an individual who did not have the requisite discretion to accommodate their religious exemption or consider alternate accommodations or

54

alternatives to terminating their non-disciplinary separation. These allegations, which were required to be accepted as true, are sufficient to state a claim for a Procedural Due Process deprivation.

The district court, however, did not reach the proper conclusion. Rather than accept the allegations in the FAC as true and drawing all reasonable inferences in Plaintiffs' favor, it correlated notice of the Proclamation as being sufficient notice and never addressed the pre-deprivation hearing or meaningful opportunity to be heard.

Even the decision in *Pilz v. Inslee*, No. 3:21-CV-05735-BJR, 2022 WL 1719172, at *7 (W.D. Wash. May 27, 2022), aff'd, No. 22-35508, 2023 WL 8866565 (9th Cir. Dec. 22, 2023) concluded that public employees that were to be terminated for not complying with the vaccine requirement were required to be given an opportunity to tell their side of the story.

This opportunity must be given because even where it is undisputed that the government employer has grounds to terminate a public employee, the employee should be allowed to explain why they should not be terminated. *Loudermill* poignantly states, "the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood." *Loudermill* 470 U.S. at 543. That is why a pre-

55

deprivation hearing is required because "[e]ven where the facts are clear *the appropriateness or necessity of the discharge may not be*." *Loudermill*, 470 U.S. at 543 (emphasis supplied).

### F. The FAC Alleged Sufficient Facts to Assert an Equal Protection Deprivation

Religion-based discrimination is rarely challenged under the Equal Protection clause. The primary reason for the paucity of equal protection cases based on religious discrimination is that those claims require discriminatory intent and Free Exercise claims do not require discriminatory intent. *See Fuqua v. Raak*, 120 F.4th 1346, 1356 (9th Cir. 2024) (explaining the difference in the prison context). And even when both a Free Exercise and Equal Protection claims are both asserted courts may elect not to decide the Equal Protection claim after ruling on the Free Exercise claim.

For example, in *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 142 S. Ct. 1987, 1995, 213 L. Ed. 2d 286 (2022), the Plaintiffs asserted claims alleging that the nonsectarian requirement of Maine's tuition assistance program violated the Free Exercise Clause and the Establishment Clause of the First Amendment, *as well as the Equal Protection Clause of the Fourteenth Amendment*. *Id*. at 776. The U.S. Supreme Court, however, went no further than the First Amendment Free Exercise claim before reversing the First Court of Appeals decision. *Id*. at 789.

This does not, however, preclude a party from asserting both claims because there may be occasion to do so. For example, hypothetically, if there was a question whether a state official who is sued in her or his personal capacity could assert qualified immunity for conduct that violated the Free Exercise Clause, but would be far less likely to succeed on asserting qualified immunity if they intended to discriminate against a person or class of persons because of their religious beliefs, then it would be wise for the plaintiff to assert both claims. It can hardly be argued that the equal protection prohibition against treating a person or class of persons differently *because of* their religious beliefs is not clearly established, if there are facts permitting a reasonable inference that the disparate treatment was because of religious beliefs then asserting the Equal Protection claim is prudent.

The district court, therefore, was incorrect when it erroneously cited a footnote in an unpublished decision that suggest the equal protection claim always collapses into the Free Exercise claim. If the district court was correct that the Plaintiffs did not allege facts sufficient to state a plausible claim for a Free Exercise deprivation, then they did not allege sufficient facts to state a claim for an Equal Protection violation. But, as previously argued, Plaintiffs alleged more than sufficient facts to establish a Free Exercise violation. If the Court agrees, then it should decide whether the allegations are sufficient to also infer the disparate treatment favoring accommodation approval for secular medical exempt employees compared to

57

accommodation approval for religious exempt employees. Here, the FAC alleges sufficient facts to support a reasonable inference that accommodation approval rates were 50% greater for medical accommodations when compared to religious accommodations because Secretary Hunter presupposed religious beliefs were less legitimate than medical reasons. That would equate to favoring approval for medical accommodations because of Plaintiffs' religious beliefs and would be an equal protection violation. While the district court did not reach the qualified immunity issues in this case when it dismissed the FAC, at some point it will have to address those issues. It would border on being a farce for the individual Appellees to argue that it was not clearly established that they were prohibited from treating religious exempt employees differently and less favorably than secular medical exempt employees when approving accommodations because of their religious beliefs.

Because the issue of qualified immunity has not yet been determined by the district court judge, if the Court reverses the district court's decision to dismiss the FAC with prejudice and without leave to amend, then his Court should also determine the FAC alleges sufficient facts to state an Equal Protection deprivation. Upon remand it should instruct the district court how an Equal Protection Claim differs from a Free Exercise claim and why that difference might impact the district court's future qualified immunity decision.

58

### G. The District Court should have Given Appellants Leave to Amend Their Pleading.

In briefing below, Appellants expressly requested that even if any claims were to be dismissed, dismissal be without prejudice and with leave to amend. 2-ER-31–32. In particular, Appellants argued that their Substantive Due Process claim could be easily repaired by adding an express reference to 42 U.S.C. § 1983 and the Fourteenth Amendment, 2-ER-36; and that their Procedural Due Process Claim could be improved if necessary by adding allegations about Appellees' failure to provide any post-termination hearing (and indeed Appellees' misclassification of Appellants' discharges as non-disciplinary, which took Appellants outside the coverage of a pre-existing regulation providing for post-termination hearings). 2-ER-37–38.

The District Court, however, held that amendment would be "futile," because "the 'underlying facts' do not 'provide proper grounds for relief,' and the Court cannot 'conceive of facts that would render' Appellants' dismissed claims 'viable.'" 1-ER-29 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (cleaned up)). The District Court's imagination was sadly lacking in this regard. As the analysis *supra* shows, if Appellants missed nudging any of their claims over the line to plausibility, they did not miss by much.

Assuming *arguendo* that the FAC was deficient, although it is not, the deficiency is fully curable. The District Court's concerns about supposedly

59

insufficient description of one or more Appellees' personal participation in violating Appellants' rights can be resolved by fleshing out those allegations a bit further. Similarly, where the District Court appears to have presumed, contrary to the FAC, that Appellees faithfully applied the standards required by the Proclamation, *see* 1-ER-19:17–20, Appellants could more explicitly allege that Appellees failed to do so and that their policy was in fact so devoid of standards as to fail of general applicability for Free Exercise purposes. Similarly, the District Court's holding that Appellants had insufficiently alleged a basis to infer non-neutrality in Appellees' policy could have been undone by adding more specific allegations about the differences in Appellees' treatment of religious and secular accommodation requests, even when both were made by the same employee. The District Court's holding that Appellees had alleged insufficient facts to show that the policy was not applied in a generally applicable way could have been undone by adding allegations about special exceptions made by Appellee Hunter, and about the Department's failure to even ask how much the proposed accommodations would have cost in money or in workplace disruption.

And the District Court's skepticism that Appellees' failure to provide pretermination hearings violated clearly-established law of procedural due process can be relieved by adding more facts about Appellees' "inadequate post-termination procedures," as that failure "can be a distinct due process violation" because "'the

60

existence of post-termination procedures is relevant to the necessary scope of pretermination procedures.'" *Smith v. Janney*, 876 F. Supp. 2d 1204, 1216 (E.D. Wash. 2012) (quoting *Loudermill*, 470 U.S. at 547 n.12). The District Court failed to discuss Appellants' allegation that "DCYF did not notify or offer any Appellant a post-deprivation evidentiary hearing regarding DCYF's accommodation denial," 7-ER-1610 ¶ 68, but additional allegations as to how such hearings could have been provided, how they were provided to medically-exempt, discharged employees, and how Appellants could and would have made use of the opportunity, would make even clearer the impact and legal significance of Appellees' failure.

In short, contrary to the District Court's inability to "conceive of facts that would render Appellants' dismissed claims viable," facts certainly **can** be alleged to render Appellants' claims viable even assuming that the claims are not quite there yet, and Appellants should have the opportunity to allege such facts.

### H. This Court Should Not Affirm the District Court's Decision on the Alternative Ground of Qualified Immunity.

This Court has the authority to affirm the District Court's dismissal without prejudice and without leave to amend on any basis. It is expected that Defendant will invite the Court to affirm based on qualified immunity. The Court should decline any such invitation. First, there is no qualified immunity for suits against the individual Defendants Hunter, Rodriguez, and Ybarra in their official capacities seeking prospective injunctive relief of reinstatement. *Cmty. House, Inc. v. City of*

*Boise, Idaho*, 623 F.3d 945, 965 (9th Cir. 2010) ("Qualified immunity, however, is a defense available only to government officials sued in their individual capacities. It is not available to those sued only in their official capacities." (citation omitted)).

The individual Defendants argued vehemently below that they were protected from all of Appellants' § 1983 claims by qualified immunity. The District Court never reached that issue. 1-ER-27. Respectfully, this Court should permit the trial court to determine the qualified immunity issue in the first instance because it would not result in determining all claims against all parties because the official capacity suits seeking prospective injunctive relief will still remain. Additionally, the individual Defendants never filed a notice of cross appeal challenging the district court's decision to not decide qualified immunity. Thus, Plaintiffs arguments to demonstrate the constitutional deprivations were clearly established is substantially prejudiced because Plaintiffs are limited to a shortened Reply Brief in which to meet their burden and address the issues raised in response to the arguments asserted herein.

Nevertheless, Appellants anticipate that Appellees may raise the issue again on appeal. Therefore, without straying long from the issues raised by the District Court's Order itself, Appellants will briefly outline the argument against qualified immunity.

62

At this stage in the proceedings, without factual development, dismissal based on qualified immunity "is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies." *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (quoting *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016)). Qualified immunity may shield government officials from personal capacity suits seeking monetary liability, where the operative complaint demonstrates the officials were performing discretionary functions, so long as their conduct does not violate clearly established statutory or constitutional rights of which reasonable officials would have known. *Harlow,* 457 U.S. at 818. Here, as Appellants will discuss in more detail on reply if necessary, the FAC does not demonstrate that qualified immunity applies to Appellants' Free Exercise, Equal Protection, or Procedural Due Process claims.

As discussed *supra*, Appellants' Free Exercise of religion claim is based on allegations that Appellees created policies under which, for practical purposes, the accommodation process was nearly useless for religious objectors to vaccination, who therefore had the stark choice "get vaccinated [in violation of their religious beliefs] or lose your job." It is well-established that forcing the choice between receiving a government benefit and adhering to one's religious beliefs, is a First Amendment violation.

63

such a policy imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny. *Lukumi*, 508 U. S., at 546, 113 S. Ct. 2217, 124 L. Ed. 2d 472. This conclusion is unremarkable in light of our prior decisions. Like the disqualification statute in *McDaniel*, the Department's policy puts Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution. Of course, Trinity Lutheran is free to continue operating as a church, just as McDaniel was free to continue being a minister. But that freedom comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the Center is otherwise fully qualified. And when the State conditions a benefit in this way, *McDaniel* says plainly that the State has punished the free exercise of religion: [4] "To condition the availability of benefits . . . upon [a recipient's] willingness to . . . surrender[ ] his religiously impelled [status] effectively penalizes the free exercise of his constitutional liberties."

*Trinity Lutheran*, 582 U.S. at 462 (quoting *McDaniel v. Paty*, 435 U. S. 618, 626, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978)); *and see Bates*, *supra*; *Blais*, *supra*.

It is at least as well established that a government employee who, like Appellants, is not hired 'at-will,' but can be terminated only for cause, has a property interest in their employment which requires both pre-termination and post-termination opportunity to be heard. *Loudermill*, 470 U.S. at 546 ("tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.") The District Court's holding that Loudermill required only notice of and publication of the Proclamation itself, relies on the assumption—which cannot be

64

made at the pleading stage in direct contradiction to the FAC—that Appellees' policies made no material change from the Proclamation. The Proclamation required adherence to existing law, which would include the notice-and-hearing requirement under the Fourteenth Amendment as described in *Loudermill*. Appellants, however, allege the implementation of policies which bypassed that requirement. 7-ER-1584–1604 (alleging as to each Appellant that "DCYF did not provide [them] with a pre-deprivation hearing [or] interactive dialogue"); *and see* 7-ER-1610 ¶ 68 ("DCYF did not notify or offer any Appellant a post-deprivation evidentiary hearing regarding DCYF's accommodation denial,") Therefore, more was required than the publication of a statewide policy, Appellees' failure to follow which is the very foundation of Appellants' claims.

Similarly, the District Court's holding that *Loudermill* was satisfied by the Appellants' mere opportunity to apply for accommodation misses the point. No reasonable inference can be drawn that Appellants, when merely told that they could apply for an exemption (and implicitly for accommodation), could have understood that they were also to argue that accommodation would not impose any undue hardship on DCYF, as compared to termination. They could not be required to predict that accommodation would be denied or why. Until this action, they never had the chance to learn and challenge the reasoning of Appellees that there could be

65

no feasible accommodation of religious objectors. As recently held by another judge

of the same District Court in a similar case,

> A pre-termination hearing must, at bottom, afford an employee a *meaningful* opportunity to be heard. *Loudermill*, 470 U.S. at 546. Accordingly, Plaintiffs are entitled to relief if they can demonstrate that their *Loudermill* hearings were essentially "sham" proceedings at which Defendants informed them of an existing and inflexible decision to terminate her employment. Stated differently, Plaintiffs are entitled to relief if they can prove that Defendants decided to terminate their employment before their pre-termination hearings and could not have been influenced by anything Plaintiffs may have said during the meetings.

*Vale v. City of Seattle*, No. 2:23-cv-01095-TLF, 2024 U.S. Dist. LEXIS 108289, at

*15 (W.D. Wash. June 18, 2024). (citing *Loudermill*, *supra*).

## I. The Court Should Enable the District Court to Award Attorney's Fees for this Appeal.

For the reasons set forth *supra*, the Court should reverse the District Court's

order and remand for further proceedings including trial. Appellants look forward

to developing their case and taking it to a jury, and they are confident that the jury

verdict will favor them.

When that happens, the District Court will have to consider whether to award

attorney's fees under 42 U.S.C. § 1988. At that time, however, the District Court

will have difficulty ordering full recompense, because arguably, the District Court

lacks authority to award fees incurred during an appeal, unless expressly authorized

to do so by this Court. This Court, of course, has the authority to award fees incurred in appellate proceedings, see 9th Cir. R. 39-1.6, but where a decision by this Court now in favor of Appellants will not resolve the case, any award now would be premature. The way to thread that needle is for this Court, when remanding to the District Court, to authorize it—in the event that Appellants are the prevailing party at the end of proceedings below—to award attorney's fees incurred in the course of this appeal.

## J. The District Court should Retain Jurisdiction over Appellants' State Law Claims.

The District Court declined to retain supplemental jurisdiction of Appellants' state law claims and therefore dismissed them without prejudice, based solely on the absence of federal claims to support jurisdiction. Once the federal claims are reinstated, the District Court will still have supplemental jurisdiction of the State law claims, and the dismissal of those claims too should be reversed.

## CONCLUSION

For the reasons set forth above, this Court should reverse the District Court's order and remand for further proceedings up to and including jury trial.

RESPECTFULLY SUBMITTED this 31st day of July 2025.

**ARNOLD JACOBOWITZ & ALVARADO PLLC**

*s/ Nathan J. Arnold*
NATHAN J. ARNOLD

67

WSBA No. 45356
720 Seneca Street, Ste. 107, No. 393
Seattle, WA 98101
(206) 799-4221
*Counsel for Appellants*

**WESTERN WASHINGTON LAW GROUP, PLLC**

*s/ Dennis McGlothin*
DENNIS MCGLOTHIN
WSBA No. 28177
10485 NE 6th St. #2620
Bellevue, WA 98004
(425) 728-7296
*Counsel for Appellants*

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance**

Instructions for this form:

http://www.ca9.uscourts.gov/forms/form18instructions.pdf

**9th Cir. Case Number(s)**      25-3282

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **13,860 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has

68

been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

**Signature:** *s/ Nathan J. Arnold*        **Date:** July 31, 2025